UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLOBALFOUNDRIES U.S. INC.,

                Plaintiff,

        v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

               Defendant.

Case No. 7:23-cv-03348-KMK-AEK

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS THE COMPLAINT**

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
Robert A. Atkins
Catherine Nyarady
Pietro J. Signoracci
Kripa Raman
1285 Avenue of the Americas
New York, New York 10019-6064

*Counsel for Defendant International
Business Machines Corporation*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................1

BACKROUND ............................................................................4

    A.    The Contracts and GF's Limited Contractual Right to Disclose ................4

        1.    The 2007 Initial Agreement ................................................4

        2.    The MTA and the ACA ....................................................5

        3.    GF's Limited Contract Rights ............................................5

    B.    GF's Breach of the Agreements and the State Court Action ...................8

    C.    GF's Complaint in this Action .............................................9

    D.    The Parties' October 2021 – April 2022 Correspondence ....................10

ARGUMENT ...........................................................................11

I.    THE COMPLAINT SHOULD BE DISMISSED OR THE CASE
    STAYED UNDER THE *COLORADO RIVER* ABSTENTION
    DOCTRINE ......................................................................11

    A.    The State and Federal Actions are Parallel Proceedings. ...................11

    B.    The Balance of *Colorado River* Factors Weighs in Favor of
        Abstention. ...........................................................13

II.    THE COMPLAINT FAILS TO STATE ANY VIABLE DTSA OR
    BREACH OF CONTRACT CLAIMS AS A MATTER OF LAW ....................16

    A.    The Complaint Should be Dismissed Because GF Has No Contract
        Rights To Post-2018 "Incremental" Improvements and Derivatives ........17

    B.    The Complaint Should Be Dismissed Because It Fails to Allege
        Any Trade Secrets With Specificity and Concreteness ....................22

III.    GF MUST AT LEAST PROVIDE A MORE DEFINITE STATEMENT
    OF ITS TRADE SECRET MISAPPROPRIATION CLAIM UNDER
    RULE 12(e) .....................................................................25

CONCLUSION .........................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdin* v. *CBS Broad. Inc.*,
 971 F.3d 57 (2d Cir. 2020) ........................................................................19

*Abe* v. *N.Y. Univ.*,
 No. 14-CV-9323 (RJS), 2016 WL 1275661 (S.D.N.Y. Mar. 30, 2016)....12, 14, 15, 16

*AlterG* v. *Boost Treadmills, LLC*,
 388 F. Supp. 3d 1133 (N.D. Cal. 2019) ......................................................22

*Am. Disposal Servs., Inc.* v. *O'Brien*,
 839 F.2d 84 (2d Cir. 1988) .........................................................................11

*Arkwright-Bos. Mfrs. Mut. Ins. Co.* v. *City of New York*,
 762 F.2d 205 (2d Cir. 1985) .......................................................................14

*Bell Atl. Corp.* v. *Twombly*,
 550 U.S. 544 (2007)........................................................................18, 19, 22

*Big Vision Private Ltd.* v. *E.I. DuPont De Nemours & Co.*,
 1 F. Supp. 3d 224 (S.D.N.Y. 2014) .............................................................23

*Brown* v. *City of Allen Park*,
 No. 17-12403, 2017 WL 6539044 (E.D. Mich. Dec. 21, 2017) ..................13

*Canal+ Image UK Ltd.* v. *Lutvack*,
 773 F. Supp. 2d 419 (S.D.N.Y. 2011) ...........................................................4

*Carter* v. *36 Hudson Assocs., LLC*,
 2010 WL 2473834 (S.D.N.Y. June 17, 2010) ............................................13

*Convolve Inc.* v. *Compaq Computer Corp.*,
 527 F. App'x 910 (Fed. Cir. 2013) ......................................................15, 17

*Cortec Indus., Inc.* v. *Sum Holding L.P.*,
 949 F.2d 42 (2d Cir. 1991) ...........................................................................4

*De Cisneros* v. *Younger*,
 871 F.2d 305 (2d Cir. 1989) .......................................................................11

*Eberhard Inv. Assocs., Inc.* v. *Santino*,
 No. 01 Civ. 3840 LMM, 2003 WL 22126846 (S.D.N.Y. Sept. 12,
 2003) ...........................................................................................................25

*First Nationwide Bank* v. *Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir.1994) ...................................................................................22

*Gen. Reinsurance Corp.* v. *Ciba-Geigy Corp.*,
   853 F.2d 78 (2d Cir. 1988) ...........................................................................12, 14

*Golub Cap. LLC* v. *NB Alternatives Advisers LLC*,
   2022 WL 540653 (S.D.N.Y. Feb. 22, 2022)............................................................17

*Kirby McInerney LLP* v. *Lee Medical, Inc.*,
   2017 WL 4685101 (S.D.N.Y. Oct. 16, 2017). ECF No. 49.......................................13

*Malin* v. *XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir.
   2009) ...............................................................................................................19, 22

*Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ....................................................................................................16

*Ottah* v. *Bracewell LLP*,
   No. 21 Civ.455 (KPF), 2021 WL 5910065 (S.D.N.Y. Dec. 10, 2021),
   *appeal dismissed,* No. 22-39, 2022 WL 2619806 (2d Cir. June 6,
   2022), and *aff'd*, No. 2022-1876, 2022 WL 16754378 (Fed. Cir. Nov.
   8, 2022) ..................................................................................................................19

*Ottah* v. *Nat'l Grid*,
   No. 19 Civ 08289 (PAE) (RWL), 2020 WL 2543105 (S.D.N.Y. Apr.
   27, 2020) ................................................................................................................19

*Pabco Const. Corp.* v. *Allegheny Millwork PBT*,
   No. 12 CIV. 7713, 2013 WL 1499402 (S.D.N.Y. Apr. 10, 2013)............................12

*Pappas Harris Cap., LLC* v. *Bregal Partners, L.P.*,
   No. 20-CV-6911 (VEC), 2021 WL 3173429 (S.D.N.Y. July 27, 2021),
   *appeal dismissed*, No. 21-2086, 2021 WL 7162177 (2d Cir. Sept. 29,
   2021) ..............................................................................................11, 12, 14, 15

*Phillips* v. *Citibank, N.A.*,
   252 F. Supp. 3d 289 (S.D.N.Y. 2017) ...........................................................8, 11, 14

*Rothbaum* v. *Bank of Am., N.A.*,
   No. 16-CV-02387 (ALC), 2017 WL 253068 (S.D.N.Y. Jan. 19, 2017) ...................19

*Smart Mortg. Centers, Inc.* v. *Noe*,
   No. 20 C 7248, 2021 WL 2291073 (N.D. Ill. June 4, 2021) ................................13, 15

*Space Data Corp* v. *X*, No. 16-cv-03260-BLF, 2017 WL 5013363, at *2
   (N.D. Cal. 2017) .....................................................................................................23

*Telebrands Corp.* v. *Del Lab'ys, Inc.*,
719 F. Supp. 2d 283 (S.D.N.Y. 2010), *report and recommendation adopted*, No. 19 Civ. 08289 (PAE) (RWL), 2020 WL 2539075 (S.D.N.Y. May 19, 2020 ...................................................................................19

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..............................................19, 22

*Weiser* v. *Koch*,
632 F. Supp. 1369 (S.D.N.Y. 1986) ........................................................12

*Zirvi*, v. *Flatley*,
433 F. Supp. 3d 448 (S.D.N.Y. 2020) ...............................................22, 24

*Zurich Am. Life Ins. Co.* v. *Nagel*,
538 F. Supp. 3d 396 (S.D.N.Y. 2021) .....................................................24

**Statutes**

18 U.S.C. § 1839(5).......................................................................................9

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) .................................................................................1

Fed. R. Civ. P. 12(b)(2) .................................................................................1

Fed. R. Civ. P. 12(b)(6) .................................................................................1

Fed. R. Civ. P. 12(e) ...............................................................................1, 25

Defendant International Business Machines Corporation ("IBM") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint of Plaintiff GlobalFoundries U.S. Inc. ("GF") under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or, in the alternative, for a more definite statement of GF's trade secret misappropriation claims under Federal Rule 12(e).

## PRELIMINARY STATEMENT

This is a highly unusual (and meritless) trade secret case.  GF asserts, in paragraph 1 of its Complaint, that "IBM is misappropriating GlobalFoundries' trade secrets."  But GF is not the sole owner of any of the "trade secrets" it says were misappropriated:  Specific Results and Albany Foreground IP.  Ex. 1 §10.1; Ex. 2, Annex III, § 1.4(ii)(a).  IBM jointly owns all of that.  GF's only potential claim against IBM is a limited *contract* right granted by IBM to control the disclosure of only certain specific information developed or improved before the end of 2018.

That circumscribed contract right is GF's sole basis for its DTSA  claim (First Cause of Action) and its breach of contract claims (Second Cause of Action).

The Court should grant IBM's motion for two primary reasons.  First, the Court should decline to take jurisdiction over this case, or stay the case, in view of a long-running state court action that could dispose of the issues in the present case.  The state case involves the same contracts that are the subject of this case and was brought by IBM against GF for fraudulent inducement and breach of those contracts.  GF's breaches go to the very heart of the parties' Albany Collaboration Agreement (the "ACA").  GF repudiated the ACA back in 2018, yet relies on it here in an attempt to disrupt IBM's new technology agreements with Intel (announced in 2021) and Rapidus (announced in 2022).  Since GF materially breached the ACA, as well as the other agreement it invokes, the Master Transaction Agreement (the "MTA"), and those material

breaches are at the heart of IBM's claims in the state court action, GF cannot proceed, much less prevail, in this case because GF must have itself performed before asserting the contracts.

Second, if the Court exercises jurisdiction, the Complaint should be dismissed for failing to state a claim. The ACA and MTA were supposed to mark the beginning of a long-term collaboration between IBM and GF dedicated to developing, manufacturing, and conducting forward-looking research projects on next-generation High Performance semiconductor chips. GF admits that the collaboration ended in December 2018 after GF had abandoned the parties' technology alliance. That date is critical here because any contract rights GF may have had to control the disclosure of information were expressly limited to information created, developed or enhanced only *during* the parties' development projects - - *i.e.*, before the end of 2018.

The disclosures that GF imagines that IBM has made in violation of its rights took place *after* 2018 - - years *after* the parties' development projects ended. That is a veritable lifetime in the semiconductor industry. GF concedes that there are constant leaps forward in semiconductor technology every few years. By 2021, when IBM announced its agreement with Intel, and by 2022, when IBM announced its agreement with Rapidus, much of the technology from before December 2018 was obsolete for developing next-generation chips. That is why it is absolutely essential in this case, perhaps more than in other trade secret cases, that GF identify and specify the alleged trade secrets from before December 2018 with precision and particularity.

GF has done the opposite:  it has alleged vague, all-encompassing post-2018 purported trade secrets over which it has no rights. The crux of GF's claim is that:  "IBM's 7nm and smaller development is ***inherently incremental*** and necessarily uses, contains and ***builds on*** innovation from decades of prior development, including GF-Controlled Trade Secrets, the licensing and disclosure of which are controlled by GF."  Compl. ¶ 113 (emphases added).  The

fatal problem with that claim is that under the relevant contracts, GF has no right to prevent IBM's disclosure of "incremental" improvements or derivatives themselves that were made by IBM after 2018 - - even if they "build on" work done with GF prior to 2018.  As a matter of contract, the Complaint is a legal non-starter.  Moreover, GF says it is "necessary" for IBM to disclose "GF-controlled Trade Secrets," but alleges no *facts* to support that, just its own say-so.

GF nevertheless tries to survive dismissal by listing an assortment of semiconductor properties and technologies it claims to control, all of which are openly discussed and published in the industry.  Indeed, at the prior conference before this Court, counsel for GF openly discussed GF's list of supposed trade secrets in public, which shows that GF itself does not consider it to be a list of trade secrets.  What is missing from the Complaint is any specific and secret invention or technological breakthrough developed before the end of 2018.  A catalogue of technical-sounding concepts and phrases does not suffice as specific technical trade secrets allegedly controlled by GF.  And under the contracts granting GF's limited rights, it does not suffice to allege trade secrets that were developed, improved or derived after December 2018.

GF tries to mask the lack of specificity in its pleading with sweeping generalities.  GF declares that its "trade secrets and proprietary technologies" at issue "go to the heart of next-generation semiconductor chips."  Compl. ¶ 2.  But that grandiose language is worse than mere hyperbole.  It illustrates what is so troubling about GF's vague and deficient pleading.  GF's goal is to interfere with IBM's ability to develop any next-generation chips with other collaborators, seemingly forever.  GF should not be permitted to cause such disruption - - and get a sneak preview of what its competitors (Intel and Rapidus) are developing in secret - - without alleging with clarity and particularity the purported trade secrets that fall within the narrow parameters of its limited contract rights.

As GF has failed to do so, the Complaint should be dismissed.  In the alternative, GF should be ordered to provide a definite statement of its pleading.

## BACKGROUND

**A.      The Contracts and GF's Limited Contractual Right to Disclose**

**1.      The 2007 Initial Agreement**

The relationship between IBM and GF began in 2007.  Compl. ¶ 20.  That year, IBM established a contractual framework for partnering with other companies called the "Master IBM Joint Development Terms and Conditions" (what GF calls the "Initial Agreement" and has incorporated by reference in the Complaint, *id.* ¶ 56).  The Initial Agreement provided the terms "governing semiconductor technology joint development projects initiated by or conducted in conjunction with" IBM.  Ex. 1, Preamble.[1, 2]

That contract was not for GF alone.  It was for other semiconductor companies as well seeking to partner with IBM at IBM Development Facilities, including the T.J. Watson Research Center and the Center for Semiconductor Research at the Albany Nanotech Complex.  *See, e.g.*, Ex. 1 § 2, Ex. 4 § 2.  IBM was (and is) the hub of cutting-edge semiconductor development in these Development Facilities.  By entering into the Initial Agreement and related agreements - - a "Participation Agreement" (Ex. 22) and "Joint Development Project Agreements" (e.g., Ex. 4) (*see* Compl. ¶ 56) - - semiconductor manufacturers were provided, for the duration of their participation, confidential access to IBM's unique, world-renowned expertise and research and development facilities in the field of advanced semiconductor research.  Ex. 1 Preamble, §§ 2,

---

[1]     On a 12(b)(6) motion, a court can consider documents that are either attached to the complaint or incorporated into it by reference.  *See Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991); *Canal+ Image UK Ltd.* v. *Lutvack*, 773 F. Supp. 2d 419, 427 (S.D.N.Y. 2011).

[2]     *See* Declaration of Robert A. Atkins dated August 21, 2023 ("Atkins Decl.").  Unless otherwise specified, citations to "Ex. __" refer to the exhibits to the Atkins Decl. filed herewith.

3.5, 7.  These IBM partners were defined as "Participating Parties," and included GF, Samsung, and numerous others.  Ex. 1 § 1; Ex. 2, Annex I.

### 2.      The MTA and the ACA

IBM and GF entered into the MTA (in 2014) and the ACA (in 2015).  Compl. ¶¶ 18, 192; Exs. 23, 2.  These are the two contracts that GF claims IBM has breached.  Compl. ¶¶ 182-88, 192-95.  Pursuant to those contracts, GF agreed to acquire IBM's chip-manufacturing business and two semiconductor fabrication facilities, received a $1.5 billion payment, and also undertook certain long-term obligations to develop, manufacture, and supply IBM with High Performance chips.  Compl. ¶ 22.  The ACA extended the term of GF's then-existing Participation Agreement, by which it had been partnering with IBM on "cutting-edge" semiconductor development.  Ex. 2 § 2.  It also provided the framework for extending the research collaboration between IBM and GF beyond 2018, with GF bearing an equal share of the cost.  Ex. 2 §§ 4-5.

### 3.      GF's Limited Contract Rights

In furtherance of what was intended to be GF's long-term relationship with IBM, the ACA granted GF certain limited, exclusive, non-patent rights to disclose two defined categories of information:  "Specific Results" and "Albany Foreground IP."  IBM did *not* grant GF sole ownership of, nor any exclusive right to use, this information.  Ex. 1 § 10.1; Ex. 2, Annex III, §§ 1.3 (i), 1.4(ii)(a)-(b).  IBM retained full joint ownership of, and the right to freely use in its own development work, those trade secrets.  In other words, the trade secrets GF lays claim to were then, and still are, jointly owned by IBM for use in developing next-generation chips.[3]

---

[3]   GF stated publicly, years ago, that it would no longer develop or manufacture any next-generation chips. *GlobalFoundries drops out of race to develop next-gen semiconductor technology*, REUTERS, Aug. 27, 2018, https://www.reuters.com/article/us-globalfoundries-nanotech-idINKCN1LC2DH; *GlobalFoundries Reshapes Technology Portfolio to Intensify Focus on Growing Demand for Differentiated Offerings*, Aug. 27, 2018, https://gf.com/gf-press-release/globalfoundries-reshapes-technology-portfolio-intensify-focus-growing-demand/.

Specific Results and Albany Foreground IP are what GF has named "GF-Controlled Trade Secrets" in the Complaint.  Compl. ¶ 19.  But each is far more narrowly defined than the Complaint would suggest.  Both cabin GF's rights to developments made during, and as part of, GF's participation in projects with IBM - - *i.e.*, before December 2018, not after.  And, the only rights GF has in "derivative works" and "improvements," are those made during, and as part of, GF's participation in certain projects with IBM - - and only before December 2018, not after.

Specific Results are defined in the Initial Agreement to include:

> All inventions, know-how, materials, information, and items ***resulting from the Development Project***, including but not limited to methods, techniques, unit processes, process flows, structures in silicon, test software, and specifications for equipment, chemicals, masks, and consumables, ***and all derivative works or improvements created or developed by or for a Party solely or jointly during and in the performance of the Development Project;*** Compl. ¶ 49 (emphases added); Ex. 1 §1.[4]

Albany Foreground IP is defined in the ACA to include:

> any information and items (other than any exclusions specified in an Albany Project Agreement) first developed, ***created or conceived under any Albany R&D Project*** by the Representatives or contractors of either or both of the Parties, including, without limitation, documentation, Albany Inventions, know-how, materials, information and items resulting from any Albany R&D Project (including, without limitation, methods, techniques, unit processes, process flows, structures in silicon, test software and specifications for equipment, chemicals, masks and consumables ***and all derivative works or improvements created or developed*** by or for a Party solely or jointly ***during and in the performance of any Albany R&D Project***). Albany Foreground IP does not include any Specific Results first developed, created or conceived under the Eagle JDA Agreements.  Compl. ¶ 51 (emphases added); Ex. 2, Annex III, § 1.1.[5]

---

[4]   Development Project refers to a specific technology development project identified in a particular Joint Development Project Agreement entered into by Participating Parties.  Ex. 1 § 1.

[5]   Albany R&D Project refers to a specific technology development project identified in a particular Albany Project Agreement entered into by IBM and GF under the ACA.  Ex. 2, Annex III, § 1.1.  Thus, Specific Results and Foreground IP were each narrowly limited buckets of IP consisting of the documented or tangible fruits of

Reinforcing GF's limited contract rights, the ACA provides expressly that GF's rights are subject to IBM's right to continue doing joint development work with other companies listed and defined as "Enablement Partners." IBM is not nearly as handcuffed in collaborating with others as GF alleges. In fact, IBM's permitted joint development programs include the right to license and disclose the Specific Results and Foreground IP to such Enablement Partners. Ex. 2, Annex III, §§ 1.3(i); 1.4(ii)(b). Furthermore, the grant of a limited license to GF to Specific Results was subject to, and did not alter, the rights of other Participating Parties in Joint Development Agreements with IBM (such as Samsung and ST Microelectronics) to disclose and sublicense the Specific Results to third parties. Ex. 2, Annex III, § 1.3(i); Ex. 2, Annex I.

Similarly, GF's rights were expressly limited to "non-patent" intellectual property. Ex. 2, Annex III §§ 1.3(i); 1.4(ii)(b). Thus, to the extent that IBM has patents that implicate Specific Results or Foreground IP, the agreements make clear that GF would receive *no exclusive rights* to such patents and IBM remains free to practice those patents in its own work and in collaboration with others, including Intel and Rapidus.[6]

GF concedes that it ceased working on any development projects with IBM by the end of 2018. *See, e.g.*, Compl. ¶ 23 ("GF and IBM continued their joint research in cutting edge semiconductor manufacturing techniques until 2018."); *id.* ¶ 79 ("GF continued working with IBM on research and development in Albany, NY until the end of 2018, at which point all Development Projects between GF and IBM were completed."). As a result, and under the plain language of the ACA and MTA, GF has *no* rights to control, and there are *no* restrictions on:

---

the development work done as part of, and during, projects in which third parties such as GF worked with IBM at IBM's research and development facilities.

[6] The limited rights granted to GF under these contracts were also in each case subject to GF's sharing with IBM of GF Licensing Income arising therefrom. Ex. 2, Annex III, § 1.3(ii). In its Complaint, GF makes no assertion that it has complied with this prerequisite for the licensing and disclosure rights its seeks to enforce.

(1) IBM's ability after 2018 to create and develop derivative works or improvements of Specific

Results or Albany Foreground IP, alone or in collaboration with its Enablement Partners; or (2)

IBM's ability to license and disclose such derivative works or improvements that were created or

developed after 2018 to other partners, like Intel and Rapidus.

### B.     GF's Breach of the Agreements and the State Court Action

The MTA and the ACA are the subject of a separate action that IBM filed against GF in

New York State Supreme Court in June 2021; it is currently pending there (the "State Action").[7]

In the State Action, IBM alleges, among other things, that GF fraudulently induced IBM to enter

into the MTA and the ACA, and that GF intentionally and materially breached both agreements.

Of particular relevance here, IBM alleges that each agreement was procured by fraud

because GF falsely represented to IBM, prior to executing the agreements, that it had made a

long-term corporate commitment to High Performance semiconductor technology.  IBM further

alleges that GF materially breached the central purposes of each agreement:  (1) regarding the

MTA, GF failed (deliberately) to use the $1.5 billion that IBM had contributed for GF to, *inter*

*alia,* develop 10nm High Performance chips, and breached the Ancillary Agreements to the

MTA by abandoning High Performance technology development; and (2) regarding the ACA,

GF failed (deliberately) to negotiate in good faith an extension of the parties' joint development

work in Albany, thereby abandoning the parties' technology collaboration on which GF bases

this action.  GF's material breaches resulted in the termination of the ACA in December 2018.

GF moved to dismiss IBM's fraud claim, but the First Department denied that motion.

The parties in the State Action have now completed fact discovery, including voluminous

---

[7]     This Court may take judicial notice of the filings in the State Action for purposes of IBM's motion to dismiss the Federal Action.  *See Phillips* v. *Citibank, N.A.*, 252 F. Supp. 3d 289, 294 n.2 (S.D.N.Y. 2017).

document productions and numerous depositions, exchanged expert reports, and are on the eve of summary judgment motions, to be followed shortly by trial.

### C. GF's Complaint in this Action

In April 2023, GF retaliated by filing the Complaint in this case. GF's Complaint asserts: (1) violation of the DTSA; and (2) breaches of contract, specifically, the ACA and the MTA. All of the rights that GF asserts it has and were violated under its DTSA claim are rights created by contract - - specifically, the ACA. GF alleges as support for its DTSA claim that IBM "had an obligation under the ACA to refrain from disclosing GF-Controlled Trade Secrets [a term made up by GF] to third parties," that IBM "breached or induced a breach of a duty under the ACA to maintain the secrecy of Specific Results and Foreground IP," and that "IBM misappropriated GF-Controlled Trade Secrets by disclosing them to one or more third parties, and using them for purposes other than those authorized by the ACA." Compl. ¶¶ 172-174. Based on these alleged *contractual* rights and *contractual* breaches under the ACA, GF asserts that "IBM's actions . . . constitute 'misappropriation' within the meaning of 18 U.S.C. § 1839(5)." *Id.* ¶ 175. Thus, all of GF's claims in this case depend on and are limited by its contractual rights.

GF alleges IBM "misappropriated" trade secrets to which GF had rights under the ACA by allegedly disclosing unspecified information to two third parties, Intel and Rapidus. *Id.* ¶¶ 7– 9. The Complaint is based on pure speculation, fails to specify the identity of the trade secrets allegedly at issue, and rests on rights that GF does not have. Paragraph 113 alleges (emphases added): "IBM's 7nm and smaller development is ***inherently incremental*** and necessarily uses, contains and ***builds on*** innovation from decades of prior development," including Specific Results and Foreground IP, which GF defines for itself as "GF-Controlled Trade Secrets" though no such definition appears in the contracts. However, as set forth above, the definitions of

Specific Results and Foreground IP make explicitly clear that improvements and derivatives made after 2018 are *not* themselves controlled by GF.

### D.  The Parties' October 2021 – April 2022 Correspondence

GF's allegations are premised largely on IBM's public statements, and in particular on statements that IBM made more than two years before GF filed its Complaint, including IBM's March 23, 2021 announcement of its collaboration with Intel.  *Id.* ¶ 9.  In October 2021, after waiting and doing nothing for seven months, GF sent IBM a Dispute Notice, pursuant to the MTA and the ACA, regarding IBM's research collaboration with Intel.  For another six months, the parties met and exchanged letters.  ECF No. 30, ¶ 6.  Throughout those communications, GF merely referenced the very same broad categories of technology and semiconductor properties it relies on in the Complaint, instead of identifying specific trade secrets, despite IBM repeatedly pressing GF for more specific information.  In correspondence with GF's counsel, IBM explained, with reference to numerous specific examples of public information, that within the broad categories identified by GF, IBM had many avenues to continue technology development with third parties that did not require disclosure of any purported GF trade secrets.  IBM also explained to GF that GF had no rights to post-2018 derivatives and improvements.  In response, GF went silent and stopped communicating with IBM in April 2022.

In conjunction with IBM's earnings announcement in April 2023, after letting yet another year go by in silence, GF then filed the Complaint, recycling allegations it had stopped pursuing a year earlier as to IBM's collaboration with Intel and adding similar allegations as to IBM's collaboration with Rapidus, of which GF had become aware of when IBM announced it in December 2022.  Compl. ¶ 8.

## <u>ARGUMENT</u>

**I.     THE COMPLAINT SHOULD BE DISMISSED OR THE CASE STAYED UNDER THE *COLORADO RIVER* ABSTENTION DOCTRINE**

"'In exceptional circumstances,' and in deference to parallel state court proceedings, federal courts may decline to exercise jurisdiction over a federal action in the interests of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Am. Disposal Servs., Inc.* v. *O'Brien*, 839 F.2d 84, 87 (2d Cir. 1988) (quoting *Colorado River Water Conservation District* v. *United States*, 424 U.S. 800, 817 (1976)) (cleaned up).  Under *Colorado River*, courts (a) assess whether the two actions are parallel, and then (b) consider six factors to determine whether the circumstances warrant abstention.  *Pappas Harris Cap., LLC* v. *Bregal Partners, L.P.*,  No. 20-CV-6911 (VEC), 2021 WL 3173429, at *3 (S.D.N.Y. July 27, 2021), *appeal dismissed*, No. 21-2086, 2021 WL 7162177 (2d Cir. Sept. 29, 2021).  "[N]o single factor is necessarily decisive," and "the test 'does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case.'"  *De Cisneros* v. *Younger*, 871 F.2d 305, 307 (2d Cir. 1989) (citing *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

This case presents "exceptional circumstances" warranting abstention.  The State Action and this case involve the same parties, the same contracts, and the same set of underlying facts.  The outcome of the State Action will determine whether GF can satisfy an essential element of its claims in this case - - namely, GF's performance of the contracts it claims that IBM breached.

### A.     The State and Federal Actions are Parallel Proceedings.

Two actions are parallel when "substantially the same parties are contemporaneously litigating substantially the same issue in another forum."  *Phillips*, 252 F. Supp. 3d at 295 (cleaned up).  "[A]bsolute congruency is not necessary to support a finding of *Colorado River*

parallelism." *Pabco Const. Corp.* v. *Allegheny Millwork PBT*, No. 12 CIV. 7713, 2013 WL 1499402, at *2 (S.D.N.Y. Apr. 10, 2013); *see also Abe* v. *N.Y. Univ.*, No. 14-CV-9323 (RJS), 2016 WL 1275661, at *6 (S.D.N.Y. Mar. 30, 2016) ("Perfect symmetry of parties and issues is not required;" cases are parallel because they "center around the same series of events") (cleaned up); *Weiser* v. *Koch*, 632 F. Supp. 1369, 1386 (S.D.N.Y. 1986) (holding that although state "litigation is not parallel in the sense . . . that all of the issues are identical . . . it is parallel in the sense that the crucial threshold issue . . . will be decided imminently").  Courts in this Circuit find parallelism *despite* differences between the claims, parties, issues, and relief sought.

In *Pappas Harris*, for example, a breach of contract and fraud suit in which the court abstained under *Colorado River*, only the federal action included a claim for tortious interference with contract.  2021 WL 3173429, at *4.  The court held that the cases were parallel, explaining that "federal courts have abstained when faced with a federal case that includes a claim or claims not in the state case, when the state case claims involve the same factual allegations as those at issue in the federal case."  *Id.* at *3.  In *Gen. Reinsurance Corp.* v. *Ciba-Geigy Corp.*, 853 F.2d 78 (2d Cir. 1988), two insurance companies sued CIBA-Geigy Corp., a company they jointly reinsured, alleging breach of contractual obligations to provide cooperation and timely notice of claims, thereby absolving the reinsurers of liability.  *Id.* at 79.  In the state action, CIBA-Geigy Corp. sued various insurers seeking declaratory relief regarding coverage obligations and contractual duties.  *Id.*  The court found parallelism though the actions raised distinct, but inextricably linked, issues arising from the same contracts.  *Id.* at 81.  The district court stayed the federal action under *Colorado River* and the Second Circuit affirmed.  *Id.* at 82.

Here, the State Action and this case are parallel.  The two actions involve the same parties (IBM and GF), the same contracts (the MTA and ACA), and the same facts of the parties'

2014 negotiations, 2015 transactions, and what followed until GF abandoned the parties'

collaboration in 2018.  The two actions also raise claims that are inextricably linked:  the State

Action necessarily will determine whether GF fraudulently induced IBM to enter into the MTA

and the ACA and whether GF materially breached those agreements, and a finding for IBM on

either score in the State Action would preclude GF from pursuing its claims in this action.  *See*

*generally id.* at 81.  Further, given the high degree of factual overlap, much of the discovery to

be taken in this action will be the same as discovery already taken in the State Action.[8]

GF argues cases are not parallel if the issues and relief sought are not the same.  ECF No.

49 at 7–8.  This heightened standard has been rejected by the applicable case law, as discussed

above.[9]  GF concedes, as it must, that "adequate performance of the contract by the plaintiff" is

an essential element of its breach of contract claim under New York law.  ECF No. 49 at 4.  And

GF's DTSA claim necessarily depends on it having a valid and enforceable contractual right to

the alleged trade secrets at issue.  *See supra*, pp. 17–22; *see, e.g.*, *Smart Mortg. Centers, Inc.* v.

*Noe*, No. 20 C 7248, 2021 WL 2291073, at *2 (N.D. Ill. June 4, 2021) (finding federal DTSA

and state court breach of contract suits parallel because "the gravamen of both suits is the same"

and "both suits rest on the same array of factual allegations" though "the claims in the state court

suit arise under state law while the claims in this suit arise under federal law").

**B.     The Balance of *Colorado River* Factors Weighs in Favor of Abstention.**

Assessing the six *Colorado River* factors demonstrates that abstention is appropriate.

---

[8]     *See Brown* v. *City of Allen Park*, No. 17-12403, 2017 WL 6539044, at *2 (E.D. Mich. Dec. 21, 2017) (noting that "much of the discovery is expected to overlap" as a basis for finding parallelism).

[9]     GF cites *Carter* v. *36 Hudson Assocs., LLC*, 2010 WL 2473834, at *3 (S.D.N.Y. June 17, 2010) and *Kirby McInerney LLP* v. *Lee Medical, Inc.*, 2017 WL 4685101, at *3 (S.D.N.Y. Oct. 16, 2017).  ECF No. 49 at 8.  Both are easily distinguished from this case.  In *Kirby*, there was a different set of parties, a different set of issues, and different relief sought in the federal case as compared to the state case.  *Id.* at *3.  In *Carter*, the overlap of issues was "severely limited" by agreements made by both sides not to pursue certain claims or categories of damages.  Neither situation is similar to this one.

1. _Res_ or Property.  The first factor considers whether the case involves a _res_ or property over which a court has exercised jurisdiction.  _See, e.g._, _Pappas_, 2021 WL 3173429 at *10. There is no property at stake, so this factor is neutral.  _Id._

2. Convenience of the Federal Forum.  The second factor "weighs, at least modestly, in favor of abstention" because, although the state and federal courts are in close proximity, "there is plainly inconvenience in having to litigate actively in both state and federal courts at the same time."  _Phillips_, 252 F. Supp 3d at 299 (cleaned up).

3. Avoidance of Piecemeal Litigation.  The third and most critical factor considers whether abstention will avoid piecemeal litigation and further judicial economy, _see Abe_, 2016 WL 1275661, at *7, or whether maintaining two suits "would waste judicial resources" and create "the serious potential for spawning an unseemly and destructive race to see which forum can resolve the same issues first."  _Arkwright-Bos. Mfrs. Mut. Ins. Co._ v. _City of New York_, 762 F.2d 205, 211 (2d Cir. 1985) (cleaned up).  Here, the prospect of piecemeal and duplicative litigation and the risk of inconsistent rulings are unavoidable.

There are decisions coming in the State Action, for example, that likely will have claim-limiting and issue preclusive effects here, including:  (1) determinations as to whether GF fraudulently induced IBM to enter into the MTA and ACA; (2) whether GF intentionally and materially breached the MTA and/or the ACA; and (3) whether GF spoliated evidence relating to the MTA or ACA, GF's fraudulent inducement, and/or GF's material breaches.  Courts have found the third factor to weigh in favor of abstention in similar factual scenarios.  _See Gen. Reinsurance Corp._, 853 F.2d at 81 (contractual disputes are intertwined and the state court action "embraces all these issues"); _Pappas Harris_, 2021 WL 3173429, at *11 (cleaned up) ("[B]oth

cases arise from the same facts, so resolution of any issue in either court may well breed

additional litigation regarding claim and issue preclusion or risk inconsistent rulings.").

4. <u>Order of Filing and Relative Progress</u>.  The fourth factor, the order in which the two

actions were filed and their relative progress, strongly favors abstention.  If significant progress

has been made in the state action, but the federal action "has not moved beyond the initial

pleadings and the motion to dismiss . . . it hardly seems wise to permit plaintiff to start anew in

federal court."  *See Pappas*, 2021 WL 3173429 at *11 (cleaned up).  That is the case here.  IBM

filed the State Action over two years ago, on June 8, 2021.  The parties engaged in extensive

motion practice and completed fact and expert discovery, and summary judgment motions and

trial are fast approaching.  "Much of the abstention case law involves federal suits that were

brought months or even days after the state suit was initiated."  *Abe*, 2016 WL 1275661 at *9.

By contrast, here, "the amount of progress in the State Action," as compared to the preliminary

stage of this federal action, "practically compel[s]" abstention.  *Id.*

5. <u>Application of Federal or State Law</u>.  The fifth factor, whether state or federal law

applies to the merits of the case, also weighs in favor of abstention.  GF's breach of contract

claims under the MTA and ACA arise under state law.  And GF's DTSA claim is based

explicitly on the parties' rights under those same contracts.  *See* Ex. 23 § 12.7, Ex. 2 § 13.6.

Thus, the DTSA claim "require[s] resolution of a logically anterior question of state contract

law."  *Smart Mortg.*, 2021 WL 2291073, at *4 (cleaned up); *see also Convolve Inc.* v. *Compaq*

*Computer Corp.*, 527 F. App'x 910, 925 (Fed. Cir. 2013) (DTSA claim constrained by contract).

In *Smart Mortgage*, the court abstained even though both claims asserted in the federal

suit - - a DTSA claim and a CFAA claim - - arose under federal law.  The Court concluded that

the presence of the DTSA claim was neutral because it depended "in large part on whether

[defendants'] postemployment restrictive covenants can be enforced, which poses a question of state law—and one at the heart of the state court suit." *Id.* Here, both the State Action and this federal case include state law breach of contract claims, and as in *Smart Mortgage*, the DTSA claim here depends on the scope and enforceability of underlying contractual rights.

6. <u>Adequate Protection of Plaintiff's Federal Rights</u>. The sixth factor considers whether the state court adequately can protect plaintiff's federal rights. As discussed above, at the heart of all of GF's claims in this case are its alleged contractual rights under the MTA and ACA. GF has expressed no doubts that the state court could adequately protect such rights. In fact, GF itself previously filed declaratory judgment claims as to those contracts in state court. *See* Ex. 3.

In addition to the enumerated six factors, the "vexatious or reactive nature" of the federal action "may influence the decision whether to defer to a parallel state litigation under *Colorado River*." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 17 n.20; *Abe*, 2016 WL 1275661, at *9–10. GF's filing of this action is reactive. GF did not raise any concern to IBM about the March 2021 Intel announcement until after GF's state court declaratory judgment action was dismissed in September 2021. The next month, GF sent a Dispute Notice to IBM about the then-7-month-old Intel announcement. After six months of letter-writing, GF disappeared on this issue for over a year from April 4, 2022 to April 19, 2023, when it filed this lawsuit. And, GF did so on the heels of the state court granting, on March 17, 2023, IBM's second motion to compel discovery into GF's spoliation of evidence. GF's conduct demonstrates a pattern of reactive tactics - - when GF does not like how it is faring in the State Action, it pursues baseless claims in other forums.

## II. THE COMPLAINT FAILS TO STATE ANY VIABLE DTSA OR BREACH OF CONTRACT CLAIMS AS A MATTER OF LAW

GF's DTSA claim (First Cause of Action) depends entirely on contractual rights it allegedly was granted under the MTA and the ACA, which are the same contractual rights at

issue in its breach of contract claims (Second Cause of Action).  Thus, as GF has failed to state a valid claim for breach of contract, for the reasons discussed below, it also has failed to state a valid DTSA claim.  *See Golub Cap. LLC* v. *NB Alternatives Advisers LLC*, 2022 WL 540653, at *13 (S.D.N.Y. Feb. 22, 2022) ("[T]he Complaint thus fails to state a claim that Defendants have breached the NDA.  It therefore follows that the misappropriation claims, which rest entirely upon the breach-of-contract claim, do not state a claim for relief and must be dismissed.").

### A.    The Complaint Should be Dismissed Because GF Has No Contract Rights To Post-2018 "Incremental" Improvements and Derivatives

The premise of GF's breach of contract and DTSA claims is that "IBM's 7nm and smaller development" - - *i.e.*, the development that IBM has engaged in ***since after*** 2018 - - is "***inherently incremental*** and necessarily uses, contains, and ***builds on*** innovation from decades of prior development, including GF-Controlled Trade Secrets, the licensing and disclosure of which are controlled by GF."  Compl. ¶ 113 (emphases added).  The problem for GF, and why all of its claims should be dismissed, is that the ACA provides that GF does *not* control any rights to any post-2018 technology developed by IBM, including any post-2018 improvements on or derivatives of pre-December 2018 technology.  *See supra* pp. 5–8; *see also Convolve, Inc.*, 527 F. App'x at 925 ("If the parties have contracted the limits of their confidential relationship regarding a particular subject matter, one party should not be able to circumvent its contractual obligations or impose new ones over the other via some implied duty of confidentiality.")

Rather, the contracts allow IBM, after 2018, to improve and build upon the pre-December 2018 information that is the subject of GF's limited exclusive rights.  *Supra* pp. 6–8.  IBM, not GF, retains the rights to license and disclose such developments and improvements.  *Supra* p. 7. This distinction is crucial, but GF's pleading ignores it.  Since IBM's agreements with Intel and

Rapidus did not begin until 2021 and 2022, it is impossible for the "inherently incremental" development work with Intel and Rapidus to have taken place before December 2018.

In Paragraph 113 of its Complaint, GF compiles a list of eleven categories of alleged pre-December 2018 semiconductor technologies and properties - - which it labels as "trade secrets" - - that it allegedly controls and that IBM allegedly is improving and building on with Intel and Rapidus.  Setting aside that GF has no rights to any post-2018 improvements or derivatives, the following features of the Complaint compel its dismissal:

First, for all the pages and technical jargon spread across those pages, nowhere does the Complaint allege *facts* to show why the semiconductor technologies Intel and Rapidus are developing with IBM (3nm and 2nm) *must* "inherently" and "necessarily" build on any of the pre-December 2018 "trade secrets" GF claims to control.  That is *ipse dixit*, not a factual allegation.  *See Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 547 (2007).  If the supposed trade secrets "are *necessary* to the IBM-Intel development partnership," as GF asserts, it should specify what those secrets are.  Compl. ¶ 113 (emphasis added).  GF needs no discovery to do so because, according to its own allegation, it already knows that IBM and Intel *must* be using "GF-controlled Trade Secrets."  There is no factual basis for that in the Complaint.

Second, the Complaint does not allege *which* items on GF's laundry list of "trade secrets" in paragraph 113 (or elsewhere) IBM must "inherently" and "necessarily" be building on:   All of them?  Some of them?  GF wants the Court to assume, without GF alleging a single fact, that next-generation chips simply cannot be developed without the amorphous "GF-Controlled Trade Secrets."  If GF's unsupported assumption were taken as an ineluctable fact, then IBM would never be able to develop a next generation of chips in collaboration with any company other than GF.  That contradicts the express language of the ACA and MTA, which, among other things,

limit GF's rights to pre-December 2018 "improvements." *See Rothbaum* v. *Bank of Am., N.A.*,
No. 16-CV-02387 (ALC), 2017 WL 253068, at *4 (S.D.N.Y. Jan. 19, 2017) (rejecting plaintiffs'
interpretation "because it would impermissibly alter, vary or contradict the terms of the
Agreement") (cleaned up).  And it would be a particularly absurd reading of GF's rights, given
that it abandoned the business of developing next-generation chips five years ago.

Courts do not have to accept such implausible assumptions on a motion to dismiss.  *See*
*Twombly*, 550 U.S. at 547; *Malin* v. *XL Cap. Ltd.*, 499 F. Supp. 2d 117, 128 (D. Conn. 2007),
*aff'd*, 312 F. App'x 400 (2d Cir. 2009) (holding that on a motion to dismiss a court need not
accept "unwarranted deductions of fact") (*quoting First Nationwide Bank* v. *Gelt Funding Corp.*,
27 F.3d 763, 771 (2d Cir.1994)); *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F.
Supp. 2d 388, 396 (S.D.N.Y. 2005) (holding the same and that the court need not accept the truth
of factual allegations contradicted by documents properly considered on a motion to dismiss).

Third, the list in Paragraph 113 (and references to other technologies) is not a list of
secret technological breakthroughs achieved by GF, alone or with IBM.  As the Court can take
judicial notice of patents, technical publications and semiconductor industry websites,[10] the list is
comprised of categories or types of semiconductor properties and technologies; and they are
properties and technologies that are widely known and the subject of open discussion and

---

[10]  *See, e.g.*, *Abdin* v. *CBS Broad. Inc.*, 971 F.3d 57, 60 n.2 (2d Cir. 2020); *Ottah* v. *Bracewell LLP*, No. 21
Civ.455 (KPF), 2021 WL 5910065, at *3 n.7, *5 (S.D.N.Y. Dec. 10, 2021), *appeal dismissed,* No. 22-39, 2022
WL 2619806 (2d Cir. June 6, 2022), and *aff'd,* No. 2022-1876, 2022 WL 16754378 (Fed. Cir. Nov. 8, 2022);
*Ottah* v. *Nat'l Grid*, No. 19 Civ 08289 (PAE) (RWL), 2020 WL 2543105, at *10 (S.D.N.Y. Apr. 27, 2020),
*report and recommendation adopted,* No. 19 Civ. 08289 (PAE) (RWL), 2020 WL 2539075 (S.D.N.Y. May 19,
2020); *Telebrands Corp.* v. *Del Lab'ys, Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010).

publication in the industry.  *See* ECF No. 43-1.[11]  None of them is a secret.  None of them is unique to GF or IBM.  And the Complaint does not allege any facts to the contrary.

Fourth, the point here is not merely that all these general properties and technologies are public.  The key point is that they are merely general properties and technologies.  The Complaint does not allege what *specific aspects* of those properties and technologies were developed or enhanced by GF with IBM.  For example, GF does not allege - - because it cannot allege - - that it invented "Nanosheet optimization."  Nanosheet is technology and optimization is utterly non-specific.[12]  What the Complaint fails to allege is any specific and secret invention or insight about Nanosheet optimization - - *i.e.*, something that would constitute pre-December 2018 Specific Results or Foreground IP.  Instead, for example, GF refers cryptically to "Process learning and optimization arising out of Albany-based development and test work."  Compl. ¶ 113.  That illustrates what is so deficient with the Complaint:  GF's claim is the equivalent of a car engine designer claiming exclusive rights relating to  "optimizing fuel efficiency," without identifying their secret or proprietary breakthrough in this category.  Such a generic complaint would be dead on arrival, and GF's claims should be rejected for the same reason.

Fifth, as a fallback, GF suggested at the Court conference that there are unimproved pre-December 2018 trade secrets IBM must necessarily be disclosing.  Counsel referred to Paragraph 111 of the Complaint.  But that assertion suffers from the same problem:  what was the specific and secret invention or breakthrough?  GF merely alleges that back in 2017, IBM and GF "were

---

[11]   Exs. 6, 8, 9, 12–14, and 17–20 are patents; Exs. 5, 7, 10, 15, and 21 are technical publications, and Exs. 11 and 16 are articles from industry websites.

[12]   "Nanosheets" are a type of advanced transistor enabling the creation of smaller chips; there is public academic literature describing this concept.  *See, e.g.*, Lei Cao et. al., "Bottom Dielectric Isolation to Suppress Sub-Fin Parasitic Channel of Vertically-Stacked Horizontal Gate-All-Around Si Nanosheets Devices," *2022 China Semiconductor Technology International Conference (CSTIC)*, Shanghai, China, 2022; J. Zhang et al., "Full Bottom Dielectric Isolation to Enable Stacked Nanosheet Transistor for Low Power and High Performance Applications," *2019 IEEE International Electron Devices Meeting (IEDM)*, San Francisco, CA, 2019.

jointly collaborating and developing GF-Controlled Trade Secrets . . . ***relating to***" several categories of semiconductor technology.  Compl. ¶ 111 (emphases added).  The phrase "relating to" is the clue but not the answer:  what is the specific, secret technological insight or invention that resulted from that collaboration?  The Complaint does not say.  Again, this is like alleging that a car engine designer controls all technology relating to improving fuel efficiency because it engaged in some work relating to unspecified technology that could improve fuel efficiency.[13]

Further, to the extent GF tries to argue that IBM did *nothing at all* to improve or build on the covered technology between 2018, when its relationship with GF ended, and 2021 or 2022, when IBM announced its agreements with Intel and Rapidus, respectively, the Complaint alleges no facts to support such an argument.  And it is plainly implausible.  As noted above, three or five years is a lifetime in this industry.  *See supra* p. 2.[14]  To grant this motion, the Court does not have to find that IBM is using no semiconductor technologies from "decades" of development.  Compl. ¶¶ 30, 35-36, 96.  After all, IBM is allowed to do that.  But to deny this motion, the Court must find that GF has alleged *facts* sufficient to identify the pre-December 2018 "GF-Controlled Trade Secrets" at issue that IBM has disclosed.  GF has not done so.  There

---

[13]   In its pre-motion letter, GF tried to argue that it "alleges IBM disclosed GF's trade secrets developed before 2018 when it disclosed 'decades' of research to Rapidus and Intel," citing Complaint ¶¶ 30-31, 35-36, 96-97. ECF No. 49 at 6.  But such allegations suffer from the same problems discussed above.  They are entirely conclusory and fail to identify any specific pre-2018 research covered by GF's limited rights under the contracts, much less demonstrate that such research remained untouched and unimproved upon by IBM in the months and years after 2018.

[14]   *See also* Michaela D. Platzer and John F. Sargent Jr., CONG. RSCH. SERV., R44544, *U.S. Semiconductor Manufacturing: Industry Trends, Global Competition, Federal Policy* 2 (2016) ("The semiconductor industry has a rapid internal product development cycle, first described by the former CEO and co-founder of Intel Corporation, Gordon Moore.  Moore's Law, which is actually an observation about the pace of development and cost reduction in chip speeds, has held true for decades.  It states that the number of transistors in a dense integrated circuit will double about every 18 months to two years, making semiconductors smaller, faster, and cheaper.  The effects of Moore's law are evident in short product life-cycles, requiring semiconductor manufacturers to maintain high levels of research and investment spending.  A main challenge for the industry is that semiconductor inventory and technology can become obsolete quickly, leaving producers with serious financial problems if they have unsalable inventories as improved designs displace existing products.")

is no basis to suggest that IBM, Intel, or Rapidus would have any use for three- or five-year old, unimproved technology.  *See Twombly*, 550 U.S. at 547; *Malin*, 499 F. Supp. 2d at 128; *First Nationwide Bank*, 27 F.3d at 771; *In re Van der Moolen*, 405 F. Supp. 2d at 396.

In short, the contracts make clear that any allegation of contractual breach or violation of the DTSA based on information developed by IBM after 2018 - - including improvements on or derivatives of pre-December 2018 information - - necessarily fails.  And because GF has not pled facts identifying information IBM allegedly disclosed to Intel or Rapidus as pre-December 2018 information, and distinguishing it from post-2018 improvements by IBM, GF's claims all fail.[15]

**B.  The Complaint Should Be Dismissed Because It Fails to Allege Any Trade Secrets With Specificity and Concreteness**

It follows from the above that all of GF's claims fail because GF has not specified the allegedly "misappropriated" trade secrets with the required particularity.  To be sufficient, GF's articulation of its purported trade secrets would, for example, have to "delineate the boundaries between [GF's] trade secrets and its information that has been made public through patents and patent applications."  *AlterG* v. *Boost Treadmills, LLC*, 388 F. Supp. 3d 1133, 1146 (N.D. Cal. 2019).  GF's Complaint fails to do so.  Instead, as discussed, the Complaint merely identifies eleven broad categories or types of semiconductor properties and technologies about which information is publicly available, and GF has not alleged a single fact to identify what aspect or features of those properties and technologies GF developed.  Compl. ¶ 113; *see supra* pp. 18–21.

---

[15]  GF's DTSA claim is also barred by the DTSA's non-retroactivity.  The vagueness of GF's complaint concerning its allegations of what has been misappropriated and when makes it difficult to determine whether all or some of the Complaint is time-barred.  The DTSA's effective date is May 11, 2016 and the DTSA does not have retroactive effect.  GF's DTSA claim relies in part on conduct GF alleges IBM engaged in prior to May 11, 2016 - - including, *e.g.*, GF's allegations that IBM improperly used information that GF claims it held exclusive rights to as of July 1, 2015, or information jointly developed by the parties from July 1, 2015 through May 11, 2016.  Therefore, GF's DTSA claim is barred as a matter of law to the extent it relies on pre-May 11, 2016 conduct.  *See Zirvi*, v. *Flatley*, 433 F. Supp. 3d 448, 463 (S.D.N.Y. 2020).

First of all, these categories of purported trade secrets are not "separate [] from matters of general knowledge in the trade or of special persons who are skilled in the trade," and they "do not [] give the Court or Defendants notice of the boundaries of this case."  *Space Data Corp* v. *X*, No. 16-cv-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. 2017).  Providing such notice in trade secret claims is essential, so that companies understand how to conduct business without purportedly trespassing on the rights of others.  *See id.*  That is especially true here, given how narrowly circumscribed GF's rights are by contract.  *See supra* pp. 5–8.  Further, given that GF waited to take legal action for two years while it knew that IBM and Intel were collaborating on chip development, IBM is entitled to know what concrete and specific trade secret that GF purportedly controls *must necessarily* have been disclosed to Intel and Rapidus.  GF is so sure that is the case, but the Complaint does not allege any facts with particularity to support it.

The significance of the fact that the categories of technology that GF points to in the Complaint appear in publications, presentations, and patents is not simply that GF's alleged "trade secrets" are not actually secret; it is that they are not secret technological inventions, insights or breakthroughs.  Rather, they are merely widely known areas of technology.  GF has failed to plead with the required specificity any so-called "GF-Controlled Secrets."  It is not enough for GF to keep saying that IBM knows what those "secrets" are.  GF has to plead them.

"It is axiomatic that a party may not assert a cause of action for misappropriation of trade secrets without identifying for the opposing party the trade secrets at issue . . . . ***[I]t is insufficient to describe the trade secrets by generic category*** . . . .  Rather, [the plaintiff] must identify the specific characteristics of each trade secret . . . .  Several district courts within this Circuit have adopted this particularity requirement, and this Court now joins them."  *Big Vision Private Ltd.* v. *E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 259 (S.D.N.Y. 2014)

(emphases added); *see also Zirvi*, 433 F. Supp. 3d at 465 ("Although the Second Circuit has not articulated a specificity requirement, district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." (cleaned up)); *Zurich Am. Life Ins. Co.* v. *Nagel*, 538 F. Supp. 3d 396, 403–06 (S.D.N.Y. 2021).

GF tries to argue for a lower standard, citing *Medtech Prod. Inc.* v. *Ranir, LLC*, 596 F. Supp. 2d 778 (S.D.N.Y. 2008). That case is inapposite. *Medtech* involved a single, specific, identifiable product (a dental "protector" to prevent harm from grinding) that allegedly was stolen by plaintiff's former employee and given to a competitor with no experience in making such a product. Given the specificity of the device, and the allegation that the former employee absconded with "manufacturing cost details, drawings, test data and other information about the design and manufacturing process" about that specific device, the Court found that the plaintiff had alleged enough. *Id.* at 788. The Court also noted that requiring a greater level of specificity would "place an onerous burden on [plaintiff.]" *Id*. at 790. GF faces no comparable burden. It is a huge corporation with a market cap of roughly $30 billion and its largest shareholder (and founder) is the sovereign wealth fund of Abu Dhabi (Mubadala) with $276 billion under management. And, again, GF claims to know that IBM *must* have disclosed some "GF-Controlled Trade Secrets." It is not a burden, and surely not an onerous one, for GF to plead with particularity what those trade secrets are that IBM allegedly must have disclosed.

Moreover, IBM first raised the troubling lack of specificity in GF's identification of purported trade secrets in 2021, in communications following GF's October 1, 2021 Dispute Notice regarding IBM's collaboration with Intel. ECF No. 30, ¶ 6. GF's continued failure with specificity nearly two years into this dispute further confirms that GF lacks any basis upon which

to allege specific trade secret misappropriation as the law requires. Without specific, particularized, and plausible allegations, GF should not be permitted to weaponize this lawsuit to find out what its competitors Intel and Rapidus are doing - - or to disrupt IBM's technology agreements which, in the case of Intel, has been progressing for more than two years.

### III.    GF MUST AT LEAST PROVIDE A MORE DEFINITE STATEMENT OF ITS TRADE SECRET MISAPPROPRIATION CLAIM UNDER RULE 12(e)

In the alternative, IBM requests that the Court direct GF to provide a more definite statement regarding its claims pursuant to Federal Rule of Civil Procedure 12(e). Relief under Rule 12(e) is appropriate where a pleading is "sufficiently intelligible for the court to be able to make out one or more potentially viable legal theories on which the claimant might proceed," but the claims are not "adequately spelled out." *Eberhard Inv. Assocs., Inc.* v. *Santino*, No. 01 Civ. 3840 LMM, 2003 WL 22126846, at *4 (S.D.N.Y. Sept. 12, 2003) (cleaned up). In *Eberhard*, the court granted a motion for a more definite statement of several claims, including a claim for misappropriation of trade secrets, because the allegations were insufficiently specific. *Id.* at 6.

As discussed above, the broad categories of technology that GF lists in its Complaint are not sufficient to give IBM notice of the specific trade secrets that GF claims were misappropriated. GF is well aware of the limited categories of IP that actually constitute Specific Results and Albany Foreground IP. GF must identify with much greater particularity what within those categories it alleges to be the trade secrets at issue in this case.

### CONCLUSION

For the reasons set forth above, IBM respectfully requests that the Court dismiss the Complaint, either for lack of jurisdiction or failure to state a claim, or that the Court stay this case pending resolution of the State Action. In the alternative, IBM requests that the Court direct GF to provide a more definite statement of its claims for misappropriation of trade secrets.

Dated: August 21, 2023
New York, New York

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP

By: */s/ Robert A. Atkins*              
    Robert A. Atkins
    Catherine Nyarady
    Pietro J. Signoracci
    Kripa Raman
    1285 Avenue of the Americas
    New York, NY 10019
    (212) 373-3000
    ratkins@paulweiss.com
    cnyarady@paulweiss.com
    psignoracci@paulweiss.com
    kraman@paulweiss.com

    *Counsel for Defendant International Business*
    *Machines Corporation*